Good morning. May it please the court, Brenton Aiken-Hammonds on behalf of Appellant Robin Winger. I'd like to first reserve three minutes for rebuttal. So there are two major legal questions on which this court could resolve this case, and the rest are factual issues that should be resolved by a jury. The first major question is whether the district court correctly granted immunity under government code section 845. As set forth in our opening brief, it's a pretty clean no that we're not correct, because Appellant was not a prisoner within the meaning of that section. If you look at government code section 844, it says, as used in this chapter, and it defines what a prisoner is. And in the subsequent chapters, including section 845.6, it makes clear that the prisoner must be somebody who is actually confined in a penal institution. That could be a jail or a prison. It does not mean somebody who has just been arrested or detained in the officer's custody. In that statute there, they use the word includes, right? And they don't necessarily say, these are the only people who are considered prisoners. They include these. Yes, it includes those. Now, there are also cases, though, published cases, including from the California Supreme Court, that make clear that there is a special relationship outside of the immunity statutes, outside of section 845.6, that's a special relationship that exists between officers and people who are taken into custody. It could be prisoners, in the case of somebody who is actually incarcerated. But it also extends to people who've been arrested or detained. And the reasoning for that is because they're not in a position, people who have been arrested or detained, are not in a position to care for themselves in terms of their own medical care. Cases we cited, Lum, which is an Eastern District case, but it cites to a number of binding California cases, including the Geraldo case, which is a California Court of Appeal case. And then recently, 2018, the Regents of California case, which cited both Lum and Geraldo with approval. So as we see, California courts have spoken decisively on this exact issue. There's no room for ambiguity here. There is a special relationship between the officers and those who they take into custody. The only other question is whether failing to summon medical care or failing to otherwise furnish it where they're required to, the only question is whether the appellant falls within the scope of 825.6. As I mentioned, she clearly does not, because she's not a prisoner. So aside from those are the two major legal issues that we believe resolves this appeal in the appellant's favor, the immunity question and then the special relationship question. In other words, the duty question. There is a duty, and the officers are not immune. Now, the rest is all facts. These are, we believe, appellant is entitled to have a jury determine them, to judge the weight and credibility of the evidence, because it's not the role of an appellate court to resolve those factual issues. So we have at least 15 facts, though, that we've cited and a number more, depending on how you read the transcripts and evidence in this case. But there are at least five that are material and disputed, one of them being the facial drooping. Facial drooping, as you may know, is a clear indication of a cerebrovascular accident or a stroke. I noticed in their report, the police report, they actually said her eyes were drooping. They checked the box for drooping eyes. And I just wondered if that had any significance as to whether there was facial. I mean, it seems, I don't know, we've done any. Where you are in this case, what the medical testimony is on that. It is certainly consistent with Annie Winger's position. That's the daughter of the appellant who's declared that facial drooping was visible. Now, the appellees have argued that because it wasn't visible on certain still frames and photographs and things like that, which are not high resolution and they can't be viewed. Like, it's not the same as, it doesn't resolve the question of whether drooping was actually there. And for that reason, appellees have disputed the existence of the drooping, OK? And just to answer your question directly, yes, it is a significant factor for eyes are drooping. It is consistent with appellant's position. Suppose Ms. Winger's appearance and behavior are consistent with both having a stroke and being under the influence of drugs. And she refuses medical treatment. So in that scenario, do police officers have a legal obligation to force her to get medical treatment? Well, there's two distinct issues. With regard to the refusal of medical treatment, it has to be a competent refusal. It has to be somebody who is knowingly and intelligently waiving, is refusing that. And here, in this case, the facts, at least with respect to that area, I mean, it seems she was pretty lucid. They asked her, do you want medical treatment? She says, no. She then explains, I was at the hospital for a week ago. I had some chest pains. Then the paramedics come in. She again refuses it, signs of form. So if you look at those facts, I mean, they seem to suggest she was pretty lucid, at least with respect to declining medical treatment. So my concern is, if you have symptoms that are consistent with both, drug use and a stroke, what are police officers supposed to do? Aren't they kind of damned if they do, damned if they don't? No, but respectfully, Judge, it is not clear that she was lucid. In fact, now that we know that she was indeed suffering a stroke, no, she wasn't competent to make that decision at that time to refuse the medical care. And the facts here actually suggest that there's no reason to believe that her refusal there would be competent, even assuming that she was not suffering a stroke and that she was merely intoxicated with drugs on some sort of a hallucinogen or something like that. There would be no reason to believe that she'd be competent to refuse medical care. Let me ask what I think may have been part of what was embedded in Judge Lee's question in a different way. So one of the concerns would be establishing a rule that basically says any time there's a DUI or a driving while impaired or anything like that, got to take the person to the hospital whether they want to or not, or whether they refuse it or not. So what is it that distinguishes this case from your standard run of the mill, this person is drunk or stoned or whatever, that would allow us to say, OK, these cases are on this side of the line. These cases are on the other side of the line. There are a number of factors to look for. Some of them would be consistent with intoxication. There would be some overlap there between a cerebrovascular accident and intoxication. However, when certain symptoms occur in conjunction and when they're entirely consistent with something like a cerebrovascular accident, then further inquiry would be warranted. The number one factor here would be facial drooping, but also the inability to answer questions in a way that, if it's completely incoherent, for example, Dr. Jiang testified that. That was the treating doctor? That was the treating doctor. He said that forgetting, not knowing one's name is different from merely slurring speech. Now, slurring speech, of course, is consistent. Not knowing your name would be not consistent with just being drunk or high. Right, that by itself would be consistent with something a lot more serious. Okay, and these officers were trained in stroke protection, right? Yes, and they were trained in that. And that brings us to Mr. Dusenbury, who testified, who declared. Is that the expert? That's the expert. Used to be a chief of police. He's testified that, based on their training and the symptoms that she was showing at the time, that it would be clear that she's suffering some sort of a medical emergency. Now, I want to address a red herring here, which is that this idea that they needed to diagnose her as having a stroke. That's not what we are arguing. They needed to recognize that she was suffering some sort of a medical emergency, not necessarily a stroke. So cerebral vascular accident, CVA, that's the terminology that is used in that community. But they are trained to recognize these things. There are a number of symptoms. The ones that we've mentioned, I enumerated them in the opening brief as well. When officers see these symptoms, that's when they are required to make further inquiry. So it's not just, it's not simply a matter of every time somebody appears drunk, we need to go and get them medical care. That, of course, would be an unreasonable burden upon officers. I'm saying that in this situation, there were a number of symptoms that the appellant displayed that were more consistent with somebody who is suffering a medical emergency. And just to be clear, as a policy matter, there are always going to be people who are having heart attacks, strokes, medical emergencies while they are driving. And that is the reason that officers are trained to differentiate between intoxication and those medical emergencies. Because taking somebody to jail when they need emergency care, of course, that would be, to excuse that in every instance would be cruel. So I'd like to also address some of the affirmative acts of the appellees here at the scene while appellant was being examined. This idea of anchor bias, which we addressed in the brief. Dr. Jang testified that because he saw this note that she had been arrested for DUI, that he was more skeptical and treated it differently than if he had just seen her without that note. And you can hear on the recording, and you can see in the transcript here, that the officers are laughing and joking with the paramedics, kind of making light and disparaging her, saying, oh, she hit the city car and then she kept going, says my chest hurts or whatever. That's, you know, he's speaking in a way that trivializes it to the people who were attending her at the time. The EMTs, who by the way, are not doctors. It's not the same as getting her the medical care that she needed. So this idea that the officers created anchor bias through their affirmative acts, and then subsequently to that, not taking her to the hospital to receive medical care when they in fact believe that she should be seen by a doctor, it shows that they took affirmative steps in order to hinder the quality of care and to delay it. So it's not merely just a failure to act. They did make some affirmative acts to that end. I'd like to reserve the rest of my time. All right, thank you counsel. Good morning, may it please the court. I'm Lois Bowback on behalf of Descendant Garden Grove Police Officers, Starnes and El Hamy. I think that at its most basic, the issue of duty in this case is whether or not California law imposes a mandatory duty on police officers to obtain medical care for an arrestee who has a serious and obvious medical condition needing immediate medical attention when, and this is the key component, when that arrestee has declined further medical care. You have to look at the question of duty in the context of the facts of this case. What if the medical conditions is something that also might affect their ability to competently make that decision? I don't think that police are in a position to make that determination. In this case, the paramedics came out before. So it's just enough that no matter how out of it they seem to be, they sign the form that says, no, that's good enough, end of story. There are certainly no case law, there's certainly no case law before this court that suggests that a conscious adult does not have the right under the 14th Amendment to make their own medical determinations. In this case, the issue of whether Ms. Winger could spell her name occurred very early on in the conversation with Officer Elhami. At that time, Officer Elhami had already called for paramedics to come to the scene. Ms. Winger then said, you know what, I'm paraphrasing, I'm okay, I don't need the paramedics. Officer Elhami didn't call them off. The paramedics still came out to the scene, still did the assessment. Why did he disregard her, I don't need it, at that point, then? He was continuing to talk to them. I don't know that there's- I guess my concern is if at point one, she says no, and the officer doesn't sort of honor that at that point, he says, no, let's go ahead and let the EMTs look at you, how can you come back now after the fact and go all the way back to the thing that he ignored at the first instance? I think that question raises a very important distinction. I think there's a critical distinction between a police officer's right to have an arrestee examined by medical personnel versus a duty owed to the arrestee where the officer can be liable in damages to the arrestee if the officer doesn't require that the arrestee see a medical personnel. So I think that's a critical distinction. There are lots of reasons why the state would want to examine a prisoner or an arrestee before they go into jail, whether they have a communicable disease, whether there was a scuffle with the police and they want to rule out any possibility. Is it a fact in this case that the police officers did in fact have training in recognizing symptoms of these drugs? Yes, they had some training. And what's the purpose of that training? The purpose of that training is to ensure that if they see somebody on the street who was in obvious distress, that they can make a call and they can call for emergency personnel. In this case, Officer Elhami didn't think that Ms. Winger had a stroke. She had her hand to her chest. And when you listen to the call to the paramedic center, he says she's complaining of chest pains. She actually never complained about chest pains, but he saw her hand on her chest and drew the conclusion that she's complaining of chest pains. Chest pains is not an objective sign of a stroke. I'm not sure how it helps you that he screwed up on that one. Yeah, because the question was they're trained to observe the signs of a stroke. Right, but there is so many things in the transcript that are just so classic and symptoms of a stroke. For example, I mean, the stroke victims are incoherent. They don't remember their name. They don't remember their birthday. They don't remember their address. All of this stuff is in this transcript. In fact, when she says, he says, what's your first name? What's your last name? And she keeps saying Rob and Robin. He starts accusing her of lying, which suggests to me that he had a foreordained view about what this was, even though when he administered the tests that would show that in fact she was under the influence of drugs and alcohol, she didn't show that she was under the influence. So what was it? I mean, it's just odd to me that if given the training that they had, that they didn't recognize at all what was really going on. Because the objective signs that she exhibited were entirely consistent with being under the influence of an intoxicant, alcohol or drugs. He smelled her breath. There was no alcohol in her breath. Drugs don't, you don't smell drugs on somebody's breath. Oh, but he thought it was alcohol. There are lots of reasons that somebody could be intoxicated. The ER doctor thought that it was drug-induced psychosis. The ER doctor, you know, had the opportunity to fully assess her. I'd like to get back to a couple of points. Whether or not a police officer has a mandatory duty, I would characterize it as a mandatory duty to disregard somebody's 14th Amendment right to refuse medical care. There is a disputed fact as to whether or not she actually signed the form refusing medical care. No, the only evidence that is posited in opposition to the motion for summary judgment was the daughter's testimony that she didn't see her mother sign it. And the husband's testimony that that wasn't her handwriting. Well, but he didn't suggest that she didn't sign it. And she has never said she didn't sign it. The paramedics saw her sign it. They questioned the validity of the signature. But you'll note there, she signed her name correctly. She wrote Robin and she wrote Winger. They questioned the signature. But of course, the paramedics don't know what her signature normally looks like. And I think one of the key components is that the paramedics who are much better trained at recognizing the symptoms of a stroke. There's no evidence that the officers are trained in anything other than a couple of hours. They get the, you know, if you have asymmetrical facial drooping and confusion and slurring and you're paralyzed on part of your body, you have chest pains or not chest pains, I'm sorry, nausea, an acute headache or dizziness. Those can be signs of a stroke. But just slurring your words and being incoherent and being clumsy, a bit clumsy, those are classic signs of intoxication. They're not signs that a reasonable police officer could assume was intoxication. And in fact- So what would have been enough to kind of kick it across the line? I don't know that there, I think certainly if she was unconscious, then- Well, then she wouldn't have been able to refuse. So that wouldn't have been an issue, I guess. I think in terms of the legal mandatory duty that a police officer summon aid, when somebody says, I don't want any more help. So let me ask this question. I mean, we're not talking about a legal mandatory duty. We're talking about a negligence claim. It's a duty of due care. Wouldn't what you say all be a question of whether the police officer breached the duty of due care when you get to a trial on the negligence claim? Well, first you have to establish that there is that duty. But it's not, we're not talking about, we're talking about negligence. We're talking about a duty of due care. We're not talking about a mandatory duty that no matter what else is out there, you must send the person to medical care. Right, but the standard rule in California is that there is no duty to render a medical care. So we're talking about creating an exception to the standard California rule that there is no duty to provide medical care, even by police officers who are investigating a traffic accident. So in order to impose liability, we have to come up with an exception to the general rule. My point is this. It would be a duty to provide medical care in appropriate circumstances. And what you described, well, she refused medical care. She seemed coherent. She signed her name. She did this, she did that. Those would all be things that you could argue said that the duty wasn't, whatever duty there was, wasn't breached or whatever the lingo would be in this case. But that's all the objective evidence that the police officers had in front of them when they made their decision. There was no- Well, except for the drooping thing, which- No, but even the drooping thing. The drooping thing was drooping on both eyes. If you have, a stroke is asymmetrical facial drooping. So you have drooping on one side of the face or the other side of the face, not drooping on both sides of the face. So I would submit that checking a box that says your eyes are droopy is not a objective- So was there a box that said one eye droopy? I don't recall, but certainly there was- How do we know that the officer checked it off because both eyes were droopy as opposed to one since there wasn't a choice for one? I can't answer that question, Your Honor. I can say though that the paramedics who are certainly in a much better position than the police officers to assess whether somebody is medically competent or is in serious need of medical care, they did not recommend to the police that the police take Ms. Winger to the hospital. They said she refused medical care. Isn't that disputed? Yeah, that was disputed, right? Because there was one of them who said that she needed medical care. One of them said, they all said that because she said she didn't feel well, it's their standard practice to recommend that somebody who says they don't feel well goes to see a doctor. But none of them said that they believed that she had a serious medical condition requiring immediate medical care. They all said that they thought she was intoxicated, that she didn't need immediate medical care, but if she didn't feel well, she should go see a doctor. And that's an important distinction. I also think it's important to note that in the first appeal of this case when the 14th Amendment issues were before the court, a panel of this court said that the police officers, like the doctors at the hospital, reasonably concluded that Ms. Winger was competent to consent to no further medical treatment. The doctors at the hospital certainly didn't think that she was incompetent, and who's better trained than an emergency room doctor? Certainly much more training than a police officer on the street to determine whether or not somebody is medically competent. I think that we reach a dangerous and slippery slope when we start saying that police officers have to be so well trained that they have to be able to make distinctions and recognize medical issues that trained emergency room doctors don't see. Maybe in this case it's just that they have to be trained to listen to what the paramedics are telling them because the paramedic said that he told the officers he thought she should be taken to the hospital. The paramedic, no, the paramedic did not say. I'm looking at his deposition testimonies right here. It's Mr. Brady. Pages 30, excuse me, 43, 44, and a couple of pages earlier than that. He said he told, that's what he said. He said he told them that he thought that she should see a doctor, not that she had a serious medical condition. We don't know what else he said. We have his declaration. But the declaration goes beyond what the guy said in the deposition and in some senses contradicts it. And the declaration was later, right? That was after he was deposed. I think it was the other way around, actually. Okay, well, I got that too. The deposition was dated April the 25th of 2014 and Mr. Brady's declaration, at least the one I got here, is 3rd of July, which is a couple months later. So he says in the deposition, page 24, were the other fire fighters with you telling her that they believe she go to the hospital? Yes. Later on, did you discuss whether or not Robin Wenger should be taken to the hospital with any of the police officers who were present at the scene of the incident on Acacia, such and such a date? Did they have a conversation with them to take her, he says, and then he says yes. He's asked the question again. He gives it yes. Who did you speak with? Officer Ohami. Do you remember Officer Starnes being there? Yes, I do. Did you tell any of the Garden Grove officers that you believe she should be taken to the hospital for examination by a physician? Answer, yes, it was discussed. So he said all that. I mean, all they have to do is be able to listen to the paramedics. They have to listen, that has to be put into context. The paramedics believed that she was under the influence. Is that what they told the officers when they had this conversation? How do we know that? We don't have the entire record of what was said. But we do know that the paramedics, the police officers have both said that the paramedics did not recommend that they take Ms. Winger to the hospital because they believed she had a serious medical condition. They admit that they were told that they thought she should be, the police officers admit that they were told by the paramedics that she should be taken to the hospital. I don't recall, Your Honor, but the police officers themselves thought that if she didn't feel well, she should go see a doctor. Have you not answered my question? I don't recall, Your Honor. Okay. I'd just like to very briefly point out a couple of more issues. The whole anchor bias issue is based on the assertion that Dr. Jane, who J-A-I-N, he was the treating neurologist. He didn't see Ms. Winger until the day after this incident. At that time, he had the benefit of the the CT scan and the MRI. And he then determined, he's the one who diagnosed that there was a stroke. The emergency room doctor did not testify that he was influenced by anchor bias. In fact, he says he teaches against anchor bias and he always makes a conscious decision not to allow anchor bias to influence his opinions. Dr. Jane testified that just hypothetically, yes, anchor bias exists and it could result in different care, but that under the specific circumstances of this case, he didn't see anything that the emergency room doctors did that would have been different if Ms. Winger or her common-law husband had not told them that Ms. Winger had been pulled over and arrested for intoxication. The last thing I think I want to say is that that same doctor, the neurologist, said that the signs of a stroke that Ms. Winger exhibited on the day of the incident were so subtle that he didn't even think that the ER doctor, let alone the police officers, would have been in a position to recognize those subtle signs. With that, I will submit. Right, thank you, Counsel. Thank you. Very briefly, Your Honor. So, Counsel had mentioned this idea that we're arguing that in every instance, we are requiring officers to infringe upon a right to refuse medical service if somebody refuses it. The Supreme Court has actually spoken on, and she said that there's no case law on this exact issue. The Supreme Court of the United States has actually spoken on this exact issue in the Cruzan case, and this is a quote here, and they say, an incompetent person is not able to make an informed and voluntary choice to exercise a right to refuse treatment. So, even acknowledging that there's this right to refuse treatment, it would not apply in this instance where there's a question about, a very legitimate question about the appellant's competence to refuse that treatment. I'd also like to address, Counsel brought up this panel's discourse in the previous holding on the constitutional claims. So, that case involved a different claim, a Section 1983 claim, where the standard was deliberate indifference, which is much higher and much more stringent than the negligence standard that we're talking about here. So, I don't think, any pronouncements that court made with regard to the officer's reasonableness, it does not translate over to the negligence standard. And also, that court did not take, they did not have the benefit of the testimony about anchor bias from Dr. Jane. Any further questions here? I do have one question. So, under your theory, when exactly did the officers breach the duty to Ms. Winger? So, they breached it first by, when they were disparaging her and then making light of her symptoms to the medical and emergency personnel that were looking at her at the scene. And then also, when they failed to, despite recognizing those symptoms and being trained to recognize a cerebral vascular accident, not taking her to a hospital so that she could be properly examined by a doctor. So, was that after the paramedics came or before? That was from the time that they were there until the time that they left, up and through the time that they, that the officers transported her to jail. Anything else? All right. Thank you very much, counsel. Winger versus City of Garden Grove will be submitted.
judges: Wardlaw, Kennelly, Lee